IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-958

Filed 20 May 2026

Catawba County, Nos. 24JA000005-170, 21JA000006-170

IN THE MATTER OF: R.D.L., K.D.L.

Appeal by respondent-mother and respondent-father from a termination of parental rights order entered 22 May 2025 by Judge Scott D. Conrad in Catawba County District Court. Heard in the Court of Appeals 22 April 2026.

> *Lauren Vaughan for petitioner-appellee Catawba County Department of Social Services.*
>
> *Sam J. Ervin, IV, for appellee Guardian ad Litem.*
>
> *Lisa Noda for respondent-appellant mother.*
>
> *Jason Senges for respondent-appellant father.*

FREEMAN, Judge.

Respondent-parents appeal from the trial court's order terminating their parental rights. On appeal respondent-parents argue that the trial court abused its discretion in terminating parental rights where the guardian ad litem ("GAL") failed to present evidence at the dispositional phase of the proceedings. Specifically, respondent-parents argue that because the GAL report was not admitted into evidence, the trial court was without any evidence from the GAL to make a best

interest determination. After careful review, we affirm the trial court's order terminating respondent-parents' rights.

## I. Factual and Procedural Background

Respondent-parents are the biological parents of Rose and Kevin.[1] On 21 February 2020, Catawba County Social Services ("CPS") received a report that after Kevin was born, his umbilical cord tested positive for methamphetamine. Because of his struggle to gain weight, he had been diagnosed as "failure to thrive" and admitted to another hospital for assessment. Respondent-parents tested negative for all substances at the time of Kevin's birth. Respondent-parents completed one of three requested drug screens and tested negative for all substances. Subsequently, CPS recommended services to respondent-parents including a substance-abuse assessment for respondent-mother and any ongoing recommendations. From 29 April 2020 to 9 January 2024, CPS received several other reports related to respondent-parents and the children.

One report alleged Kevin missed a two month well-child check that had not been rescheduled, and from 4 March 2021 to 6 May 2022 Kevin had not seen a doctor. At his last doctor's appointment, Kevin failed an eye test but was not taken to the doctors to whom he was referred to because respondent-parents explained to CPS they had no reliable transportation at the time. Social workers recommended

---

[1]Pseudonyms are used to protect the identities of the minor children. *See* N.C. R. App. P. 42(b).

"scheduling with Medicaid transportation for these appointments if they have transportation issues in the future."

Another report alleged that Rose missed sixty-five days of school and truancy was filed. After Rose returned to school, she continued to be tardy. Reporters shared "concerns" that Rose had a "learning disability." But later, Rose's attendance improved, the truancy petition was dismissed, and Rose was placed on an individualized education program ("IEP").

Throughout CPS investigations related to these reports, social workers observed respondent-parents and the children lived in a home with the children's paternal grandfather and paternal uncle. Their home "met minimum standards" and had various clutter in the yard and inside the home. Although this clutter was not a safety hazard, social workers reported it had the potential to become a safety hazard. Social workers and reporters also observed respondent-mother had scabs "indicative of substance abuse" but no open wounds or scars.

On 8 January 2024, respondent-parents and the children were evicted from their home, and respondent-parents were subsequently arrested for second-degree trespassing. When law enforcement arrived at the home to evict respondent-parents and the children, four-year-old Kevin "was observed to be strapped in an infant car seat that ha[d] no cushion padding on the porch of the home and covered from head to toe in feces that neither parent was tending to remove." Respondent-father later admitted to law enforcement that Kevin was kept strapped in an infant car seat with

no padding—that respondent-father had screwed to the floor inside their home to prevent Kevin from falling out—"24/7/365" or over twenty hours a day. Kevin was observed to have multiple bruises on his spine, injuries on his waist, and scars on his buttocks. Kevin was also observed to be unable to walk or stand without assistance.

On 9 January 2024, CPS also received a report related to the eviction. That report contained the same factual allegations and further described that other people were in the home when the family was evicted and respondent-parents were arrested. The children went home with one of those people, who observed Kevin was "covered in poop." Kevin was "unable to talk" and appeared "delayed." Further, when bathing Kevin after leaving respondent-parent's home, Kevin had bruises along his spine. The reporter shared with CPS that "the family and other adults in the home ha[d] a long history of meth use" and were "concerned [respondent-parents would] get bailed out of jail and come get the children." Later CPS investigation revealed Kevin was "not potty trained and [did] not have any diapers, so he use[d] the bathroom on himself regularly."

On 10 January 2024, CPS filed a petition alleging Rose and Kevin, ages thirteen and three respectively, were neglected and dependent juveniles. That same day, CPS obtained nonsecure custody of the children. The next day, respondent-mother tested positive for methamphetamines. On 18 January 2024, respondent-mother and Kevin tested positive for methamphetamines.

On 19 January 2024, the children were adjudicated neglected and dependent.

The trial court then found respondent-parents each had one hour of weekly visitation with the children. Respondent-parents visited with the children at DSS once before the hearing and "the visit went well." The trial court then ordered respondent-parents to comply with case plans focused on housing, employment, substance abuse treatment, counseling, psychological assessment and parenting education. The trial court awarded each respondent-parent "a minimum of four-hours per month" supervised visitation along with a maximum of thirty minute, once a week "reasonable telephone/video calls[.]"

On 8 April 2024, the trial court held a permanency planning hearing. In its 16 May 2024 order, the trial court found respondent-mother made progress on the employment, substance abuse treatment, counseling, and psychological assessment components of her case plan, but "still [did] not seem to quite understand the impact of the decisions she made while parenting the children." Respondent-father made progress on the same components of his case plan and "show[ed] remorse for his maltreatment of the children." Respondent-parents "attended every visit since the children came into foster care[,]" and engaged with the children by playing and asking both the children and foster parents meaningful questions. The trial court then made the primary plan reunification and the secondary plan adoption.

On 1 July 2024, the trial court held a permanency planning hearing. In its 12 August 2024 order, the trial court found that respondent-parents were arrested on 12 April 2024 for felony child abuse charges related to Kevin; were unemployed and

homeless; and would be referred to any parenting classes available to them while incarcerated. Kevin's placement "was disrupted" on 6 June 2024; however, CPS arranged for the children to meet monthly and on 27 June 2024, the children visited one another where they "enjoyed tickles, laughs, and hugs." The primary and secondary plans remained the same.

On 22 October 2024, the trial court held a permanency planning hearing. In its 19 November 2024 order, the trial court found that in August 2024, respondent-mother was convicted of child abuse inflicting serious injury and would be incarcerated for the remainder of the proceedings. Further, respondent-mother would have to wait forty-five days to enroll in substance abuse classes, per prison policy. Respondent-father remained incarcerated and reported he had completed online parenting classes; however, he had not shared "any certificates of completion or a list of his classes." The trial court then made adoption the primary plan, and reunification the secondary plan. The trial court ceased in-person visitation while respondent-parents remained incarcerated but continued to allow phone contact. In the event either respondent-parent was released from prison, the trial court provided a minimum of one hour per month supervised visitation.

On 5 February 2025, CPS filed a motion to terminate respondent-parents parental rights. In that motion, CPS alleged in November 2024, respondent-father was convicted of child abuse inflicting serious injury and would be incarcerated for the remainder of the proceedings.

The termination of parental rights hearing was held on 22 April to 25 April 2025, and 21 May to 22 May 2025. During the adjudicatory portion, the trial court heard testimony from multiple social workers, a senior investigator of the Catawba County Sheriff's Office, a hospital records custodian, and respondent-mother. The trial court also received various medical records, photographs of the children, and copies of respondent-parent's criminal judgments. On 24 April 2025, a motion to appoint a Rule 17 GAL for respondent-mother was heard and denied. On the last day of the hearing, during the dispositional phase, the trial court and attorneys discussed:

> THE COURT: I don't think I indicated earlier, but I am gonna—I'm considering receiving evidence that was presented at the adjudication phase for the purposes of disposition also.
>
> . . . .
>
> THE COURT: Ms. Vaughn with the guardian?
>
> MS. VAUGHN: Other than a report, no, your honor.
>
> THE COURT: All right. . . .

At the disposition portion of the hearing, the trial court also received a CPS report, a letter from Rose, and testimony from a social worker and a foster parent. All parties agreed to waive any closing argument as it related to disposition. The trial court orally agreed to incorporate the reports of both the GAL and CPS into its factual findings but did not indicate the same in its final written order.

On 23 June 2025, the trial court entered a written order concluding that grounds exist to terminate respondent-parent's parental rights under N.C.G.S. §§ 7B-

1111(a)(1), (2), (6), and (8), and that termination was in the children's best interest. Respondent-parents filed written notice of appeal on 17 July 2025.

## II.    Jurisdiction

This Court has jurisdiction to review "[a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights."  N.C.G.S. § 7B-1001(a)(7) (2025).

## III.    Standard of Review

"Proceedings to terminate parental rights occur in two phases: (1) the adjudication phase, and (2) the disposition phase[,]" *In re J.A.P.*, 189 N.C. App. 683, 687 (2008), and these two stages "trigger two distinct standards of review on appeal[,]" *In re X.I.F.*, 297 N.C. App. 799, 805 (2025).

At the first stage, or the adjudicatory phase, the petitioner is required to prove by clear and convincing evidence that grounds under section 7B-1111 exist to terminate respondent's parental rights.  N.C.G.S. § 7B-1111 (2025) (amended in 2025 to remove "cogent" but applying the same burden of proof); N.C.G.S. § 7B-1109(f) (2025) ("The rules of evidence in civil cases shall apply.").  When reviewing the adjudicatory phase of a termination of parental rights proceeding, this Court asks whether the trial court's finding of fact is supported by clear and convincing evidence. *In re X.I.F.*, 297 N.C. App. at 805–06.  If the trial court's finding of fact is supported by clear and convincing evidence, then "it will be deemed conclusive even if the record contains evidence that would support a contrary finding."  *Id.* (cleaned up). "We

review whether the findings of fact support the conclusions of law, and conclusions of law are reviewed de novo." *In re S.R.*, 384 N.C. 516, 520 (2023).

"After an adjudication that one or more grounds for terminating a parent's rights exist, the [trial] court shall determine [in the dispositional phase] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2025). Our General Statutes create a lower evidentiary standard at the dispositional phase, as "[t]he [trial] court may consider any evidence, including hearsay evidence as defined by [N.C.G.S.] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." *Id.*

"The trial court's assessment of a [child]'s best interests at the dispositional stage is reviewed solely for abuse of discretion, and we review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence." *In re X.I.F.*, 297 N.C. App. at 806 (cleaned up). A trial court abuses its discretion when the "court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re C.B.*, 375 N.C. 556, 560 (2020) (cleaned up).

## IV.    Discussion

Respondent-parents argue that the trial court erred in the dispositional phase of the termination of parental rights hearing when it made a best interest determination absent competent evidence from the GAL. Specifically, respondent-parents maintain the GAL failed to present any evidence at the dispositional phase

of the proceeding when the GAL report was not offered into evidence, and thus "no foundation for the report was laid, no opportunity for the other parties to object, and no ruling by the trial court that the report had been admitted as an exhibit." Likewise, respondent-parents argue: "There was no certificate of service with the GAL report, evidencing other parties even knew the report was filed with the clerk's office."

Chapter 7B of our General Statutes, otherwise known as the juvenile code, provides that at the dispositional phase, "[t]he [trial] court may consider any evidence, including hearsay evidence as defined by [N.C.G.S.] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." N.C.G.S. § 7B-1110(a); *see also* N.C.G.S. § 7B-901(a) (2025) (governing initial disposition hearings and providing the same evidentiary standard). *Cf.* N.C.G.S. § 7B-1109(f) (In the adjudicatory phase, "[t]he rules of evidence in civil cases shall apply."). Our Supreme Court has also described this statutory scheme and explained:

> These statutes make clear that during the adjudication stage of a termination proceeding, the trial court must apply the provisions of the North Carolina Rules of Evidence that apply in all civil cases. During the dispositional stage, conversely, the trial court retains significantly more discretion in its receipt of evidence and may admit any evidence that it considers to be relevant, reliable, and necessary in its inquiry into the child's best interests—even if such evidence would be inadmissible under the Rules of Evidence.

*In re R.D.*, 376 N.C. 244, 250–51 (2020) (emphasis omitted).[2]

To illustrate, this Court has concluded where the record was clear that the trial court both "received and intended to consider [DSS and GAL] reports as evidence" the respondent-mother's argument "that she had no opportunity to object at the permanency planning hearing, absent a formal tender of the reports into evidence by DSS and the GAL" was meritless. *In re J.H.*, 244 N.C. App. 255, 269–70 (2015). Put simply, because of the relaxed nature of dispositional hearings, like permanency planning hearings, the trial court is "free to consider written reports submitted by [a party] without a formal proffer and admission of these documents into evidence as exhibits." *Id.* at 270.

During the dispositional phase of a juvenile proceeding, the GAL "*must* offer evidence, either written reports, testimony, or both, recommending to the trial court which course of action is in the best interests of the child." *In re S.D.H.*, 296 N.C. App. 392, 401 (2024) (emphasis added); *see also* N.C.G.S. § 7B-601(a) (2025) (describing the mandatory duties of a GAL). Without this information, "the trial court is not properly equipped to rule on best interests," and thus this Court would be in "no position to review the trial court's dispositional ruling." *In re S.D.H.*, 296 N.C. App. at 401; *see also* N.C.G.S. § 7B-1110(a) (listing mandatory criteria the trial court

---

[2] This makes practical sense where one of the purposes of the juvenile code is to "ensur[e] that the best interests of the juvenile are of paramount consideration by the court and that when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time." N.C.G.S. § 7B-100(5) (2025).

must consider and make written factual findings regarding when determining whether it is in the best interest of a child to terminate parental rights).

Like *In re J.H.*, here too respondent-parent's argument is meritless. *See* 244 N.C. App. at 269–70. The record on appeal reveals the GAL offered a report to the trial court, and the trial court received and intended to consider the reports as evidence when the trial court expressly stated it would incorporate the GAL and CPS reports into its factual findings. Here, the trial court also received evidence beyond the GAL report including medical records, photographs of the children, a letter from Rose, respondent-parent's criminal judgments, and testimony from more than five different individuals. *See In re S.D.H.*, 296 N.C. App. at 401 (A GAL "must offer evidence, either written reports, testimony, or both, recommending to the trial court which course of action is in the best interests of the child."). Thus, the GAL fulfilled its duties where it offered evidence to the trial court regarding the best interests of the children. Accordingly, the trial court did not abuse its discretion by making a dispositional ruling when it received and intended to consider the GAL report as evidence.

## V. Conclusion

Because the GAL offered evidence to the trial court during the dispositional phase of the termination of parental rights proceeding, and the trial court received and intended to consider the GAL report as evidence at that stage of the proceeding, we affirm the trial court's order terminating respondent-parent's parental rights.

AFFIRMED.

Judges ZACHARY and GRIFFIN concur.